1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

9
10
11
12
13
14
15
16
17
18
19

| | |
|---|---|
| RENEE KVEK, individually and as a representative of a class of all others similarly situated and on behalf of the Cushman & Wakefield 401(k) Plan,<br><br>Plaintiff,<br><br>v.<br><br>CUSHMAN & WAKEFIELD, U.S., INC., CUSHMAN & WAKEFIELD INVESTMENT COMMITTEE, and JOHN and JANE DOES 1-20,<br><br>Defendants. | No.    2:26-cv-736<br><br>COMPLAINT—CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

20
21
22

Plaintiff Renee Kvek, by and through her attorneys, on behalf of herself, all others similarly situated, and the Cushman & Wakefield 401(k) Plan, states and alleges as follows:

23

## I.    NATURE OF THE ACTION

24
25
26

1.     This is a civil enforcement action brought pursuant to Sections 502(a)(2) and 502(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1132(a)(2) and (a)(3). Plaintiff brings this action on behalf of the Cushman & Wakefield

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

401(k) Plan (the "Plan"), and the class of participants and beneficiaries of the Plan described below. Plan participants are current or former employees of Cushman & Wakefield U.S., Inc. and certain of its affiliates ("Cushman" or the "Company").

2.    This case concerns the failure by Cushman—a highly-sophisticated fiduciary of one of the largest retirement plans in the United States—to engage in the thorough, unbiased deliberative process that is legally mandated under ERISA when selecting and monitoring the 401(k) investment options that it offers to tens of thousands of its employees.

3.    This fiduciary failure is laid bare by Cushman's selection and retention of a wholly unsuitable fund in spite of numerous glaring red flags, including chronic underperformance, dangerous aggregation of climate change-related financial risk, unreasonably high fees, and limited market acceptance. This resulted in employees suffering losses to their retirement savings, and to this day exposes those savings to undue risk of even more severe losses going forward.

4.    When enacting ERISA, Congress imposed strict duties on retirement plan fiduciaries, requiring them to act prudently and solely in the interest of plan participants. Among other things, fiduciaries must establish and follow processes to ensure that plan participants' savings are not exposed to excessive levels of risk, and must monitor investment options to ensure that their fees, performance, and risk levels are appropriate for retirement savings.

5.    ERISA was designed to protect retirement security and requires fiduciaries to protect workers from risks that would undermine that goal.

6.    Climate change-related risk presents precisely that kind of threat: it is financially substantial, it is escalating, and it imperils the value and stability of investments across asset classes – causing both sudden and long-term harms. And because such risk is not constrained to one or two industries, it can accumulate within diversified portfolios if not properly evaluated and managed as a discrete concern.

7.    The significant cross-sector financial impacts of climate change have become increasingly apparent in recent years. Wildfires, storms, droughts, and other weather-related events

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

have increased in frequency and destructive capacity, resulting in severe financial losses. Likewise, policy, regulatory, and technological changes responding to climate change have altered the risk-return outlook for companies and industries that rely heavily on climate pollutants like fossil fuels. This has prompted investors and companies to assess and model climate-related financial risks, and to construct their investment portfolios to manage those risks.

8.    Defendants themselves are acutely aware of these risks. When it comes to protecting shareholder value and its clients' portfolios, Cushman has a long track record of managing climate-related financial risks. In its own operation, Cushman has implemented a sophisticated climate risk strategy, employing a range of climate risk management tools to inform its financial decisions and marketing itself as an expert in assessing and mitigating climate-related risks. In so doing, Cushman publicly cautions that "[c]limate risk is financial risk"[1] and solicits clients for its climate risk advisory business with the tagline: "We help you understand how climate change could affect your assets or portfolio and guide you in managing and disclosing your climate-related risks and opportunities."[2]

9.    Defendants' prudent and proactive management of climate-related financial risks in their own operations stands in stark contrast to their mismanagement of the Plan. With their workers' money at stake, rather than their own, Defendants exposed employee retirement savings to significant, unreasonable climate-related financial risk—apparently failing to employ any climate risk management strategy at all.

10.    A prime example of this failure is the inclusion of the Westwood Quality SmallCap Fund (the "Westwood Fund" or the "Fund") as a fund option on the Company's 401(k) menu.

11.    The Westwood Fund does not belong anywhere near anyone's retirement savings. It boasts an unsavory combination of financial underperformance and unreasonably high fees,

---

[1] Cushman & Wakefield, *Climate Risk: Global Cities Outlook* 6 (2024/2025), https://assets.cushmanwakefield.com/-/media/cw/apac/vietnam/insights/2024/climate-risk-report_en.pdf.
[2] *Id.* at 16; Cushman & Wakefield, Sustainability Services, https://www.cushmanwakefield.com/en/services/sustainability (last visited Feb. 27, 2026).

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

while at the same time exposing investors to massive amounts of climate-related financial risk that threaten to wipe out years of savings under any number of highly plausible scenarios.

12. The Westwood Fund is openly indifferent to climate risk: its managers declare that they neither model nor manage climate risk in the Fund's portfolio. Unsurprisingly, this climate risk blindness has led the Fund to aggregate inordinate levels of climate-related financial risk across its investment sectors.

13. Compared to its benchmark index, the Westwood Fund is more than twice as exposed to sectors that are particularly vulnerable to climate-related financial risk. This overweighting in risky sectors is bad enough, but even in sectors that should provide a hedge against climate risk, the Fund invests disproportionately in companies with high climate risk exposure.

14. Where serious financial risks are allowed to aggregate, losses can materialize rapidly and in devastating fashion. Consider, for example, the fall-out from mortgage-backed securities in 2008. There, the bundling of sub-prime mortgages concentrated risk in the same vehicles, such that, when an adverse event occurred, those "secure" investments were anything but secure. Climate-related risk can likewise accumulate across a portfolio and materialize through physical events, regulatory developments, or market shifts, which could result in sudden, substantial losses. Given the availability of information and tools to assess and mitigate climate-related financial risk, exposing Plan participants to highly concentrated levels of this risk is neither prudent nor in participants' sole interest.

15. The Westwood Fund's aggregation of climate-related financial risk threatens the retirement security of every worker whose 401(k) savings are invested in the Fund. That those workers are already being harmed by the Westwood Fund's high fees and lackluster performance throws the unreasonableness of this risk into stark relief.

16. The Westwood Fund's elevated risk, poor performance, and high fees were known to Defendants when they selected the investment for the Plan, and these warning signs have only

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

grown more obvious since that point. Nevertheless, Defendants have allowed the Westwood Fund to remain in the Plan for years.

17.    Worse yet, Defendants' selection and retention of the Westwood Fund was not the result of mere imprudence. Rather, it was influenced by Fidelity, who benefited from the Plan's investment in the Westwood Fund. Fidelity—who, though various affiliates, served as the Plan's trustee, recordkeeper, and investment advisor—stood to earn additional compensation from Cushman's investment of the Plan's assets in the Westwood Fund. As discussed below in Section V.B., Defendants should have, but failed to, properly account for Fidelity's conflict of interest before selecting the Westwood Fund for the Plan.

18.    Plaintiffs therefore bring this action to require Defendants to restore the losses caused by their mismanagement of the Plan and to obtain injunctive relief to prevent further mismanagement.

## II.    JURISDICTION AND VENUE

19.    **Subject Matter Jurisdiction**. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(a), 29 U.S.C. § 1132(a).

20.    **Personal Jurisdiction**. This Court has personal jurisdiction over Defendants because they transact business in, and have significant contacts with, this District, including activities related to the recruitment and employment of personnel residing in the District.

21.    **Venue**. Venue is proper in this district and in this division for at least the following reasons:

a. Defendants' alleged breaches of fiduciary duty took place in the Western District of Washington State, where Kvek resides, because her deferred wages were diverted into an imprudent fund option in the Western District of Washington State;

b. Cushman and other Defendants may be found in this District, as the Company transacts business and employs individuals in the Western District of Washington

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

State.

## III.    PARTIES

### A. Plaintiff

22.    Plaintiff Kvek is a former employee of the Company and a current participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). Plaintiff worked for the Company from October 2021 to October 2024.

23.    Plaintiff Kvek is fully vested in her Plan account, which is currently invested in the Westwood Fund. She has suffered a financial injury as a result of Defendants' unlawful conduct described herein.

24.    Plaintiff Kvek receives her benefits and resides in this District.

### B. Defendants

#### a.    Cushman & Wakefield, U.S., Inc.

25.    Defendant Cushman maintains its headquarters in Chicago, Illinois. Cushman resides in Seattle in Washington (King County) because it has substantial business activity and operations in Seattle, WA. It provides various commercial real estate services including property management, leasing, capital market transactions, and valuation advisory to real estate occupiers and investors. Cushman and its affiliates have approximately 53,000 employees in nearly 350 offices and approximately 60 countries, managing approximately 6.5 billion square feet of commercial real estate space globally and generating over $9 billion in revenue annually. U.S. operations account for a substantial majority of both revenue and headcount across the enterprise.

26.    Cushman is the sponsor of the Plan within the meaning of 29 U.S.C. § 1002(16)(B).

27.    Cushman is also the Plan administrator, 29 U.S.C. § 1002(16)(A), and according to the Summary Plan Description, the Plan is administered in Chicago, Illinois.

28.    Cushman is a named fiduciary within the meaning of 29 U.S.C. § 1102(a) with the authority to manage the assets of the Plan.

29.    The Plan Document provides that Defendant Cushman has responsibility for all

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

investment-related decisions of the Plan.

30.     As such, during the Class Period (from January 1, 2021 through the date of judgement for this lawsuit), Defendant Cushman was a fiduciary to the Plan within the meaning of 29 U.S.C. § 1002(21)(A) because, *inter alia,* it had discretionary authority or discretionary responsibility in the administration of the Plan and exercised control over the Plan's assets.

b.     Cushman & Wakefield Investment Committee

31.     Defendant Cushman & Wakefield Investment Committee[3] (the "Investment Committee") is responsible for the oversight and management of the Plan, including selecting investment options for the Plan's menu and monitoring those investments.

32.     Plaintiff does not currently know the identity of the Plan's fiduciaries who served on the Investment Committee during the Class Period. Once the identities of those not currently named, if any, are ascertained, Plaintiff will seek leave to join them under their true names. These unidentified individuals are referred to as John and Jane Does 1-20 herein.

33.     The Investment Committee and its individual members during the Class Period, currently named as John and Jane Does 1-20, are collectively referred to as the "Investment Committee Defendants."

34.     The Investment Committee Defendants were responsible for selecting and monitoring the investment options available through the Plan during the Class Period. As part of this responsibility, the Investment Committee Defendants had the authority and responsibility to remove imprudent investment options from the Plan's menu.

35.     During the Class Period, the Investment Committee Defendants added, or caused to be added, the Westwood Fund as an investment option for the Plan.

36.     As such, during the Class Period, the Investment Committee Defendants were fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A) because, *inter alia*, they (1) exercised

---

[3] Formerly known as the Cushman & Wakefield 401(k) Plan Committee.

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

discretionary authority or discretionary control respecting management of the Plan; (2) exercised authority or control respecting management or disposition of its assets; and (3) had discretionary authority or discretionary responsibility over the administration of the Plan.

## IV.    BACKGROUND ON RETIREMENT RISK MANAGEMENT

### A. Climate Risk is Widely Recognized as a Financial Risk Impacting Investment Returns

37.    Investors have long recognized climate change as a material financial risk to both companies and the financial system. As the Supreme Court acknowledged almost 20 years ago, "[t]he harms associated with climate change are serious and well recognized."[4] Such harms, and the risks to investment portfolios that climate change presents, have only increased in the intervening years.[5] As the climate changes, so does the financial risk landscape for investors,[6] a fact that Cushman has repeatedly acknowledged.[7] Prudent fiduciaries managing long-term investments therefore routinely account for climate risk in their decision-making.

38.    The changing climate is already altering weather patterns and increasing the frequency and severity of storms, wildfires, and other extreme weather events, increasing the cost of physical climate-related hazards to many companies that make up retirement portfolios.[8] Climate change-fueled extreme weather events are currently responsible for hundreds of billions

---

[4] *Massachusetts v. EPA*, 549 U.S. 497, 521 (2007).

[5] *See* Fin. Stability Oversight Council, *Report on Climate-Related Financial Risk* 10 (2021), https://home.treasury.gov/system/files/261/FSOC-Climate-Report.pdf ("The intensity and frequency of extreme weather and climate-related disaster events are increasing and already imposing substantial economic costs. Such costs to the economy are expected to increase further as the cumulative impacts of past and ongoing global emissions continue to drive rising global temperatures and related climate changes, leading to increased climate-related risks to the financial system.").

[6] *Id* at 12. *See, e.g.*, EDHEC-Risk Climate Impact Inst., *How Does Climate Risk Affect Global Equity Valuations? A Novel Approach* (July 2024), https://climateinstitute.edhec.edu/publications/how-does-climate-risk-affect-global-equity-valuations-novel-approach [https://perma.cc/Y5UF-5UKU] (noting the downward correction in global equity valuation could be as severe as 40% absent global emissions reductions).

[7] *See, e.g.*, Cushman & Wakefield, *How to Manage Climate Risk: A Practical Sustainability Guide* 11 (2023), https://cushwake.cld.bz/how-to-manage-climate-risk.

[8] *See* S&P Global, *For the World's Largest Companies, Climate Physical Risks Have a $1.2 Trillion Annual Price Tag by the 2050s* (Mar. 10, 2025), https://www.spglobal.com/sustainable1/en/insights/special-editorial/ceraweek-physical-risk.

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

of dollars of losses annually, and are only expected to worsen.[9] In 2025 alone, the U.S. sustained 23 separate billion-dollar-plus weather and climate disasters, resulting in $115 billion in damages to homes, businesses, and other infrastructure.[10] Beyond direct property damage, physical climate-related impacts increasingly disrupt industrial supply chains, constrain access to raw materials, impair labor productivity, and interrupt production.[11] Such disruptions force companies to revise forecasts, record impairments, and absorb losses that directly reduce enterprise value.[12]

39.    And climate risk is not only physical. The need for states and institutions to mitigate and adapt to a changing climate introduces transition risks: uncertainties associated with shifting policy environments (such as carbon taxes or policy supports for renewables), social practices (such as shifts in public preferences away from polluting activities), and technological developments (such as the rapid deployment of affordable renewable energy technology like solar and batteries that displace legacy energy sources).[13] A growing subset of transition risk is legal risk, which is increasingly impacting companies' bottom lines through "direct financial penalties, reputational harm, operational disruption and shifts in investor or regulatory expectations."[14]

---

[9] *See* Adam B. Smith, *2024: An Active Year of U.S. Billion-Dollar Weather and Climate Disasters* (Jan. 10, 2025), https://www.climate.gov/news-features/blogs/beyond-data/2024-active-year-us-billion-dollar-weather-and-climate-disasters.

[10] *See* Climate Central, U.S. Billion-Dollar Weather and Climate Disasters (2025), https://www.climatecentral.org/climate-services/billion-dollar-disasters.

[11] *See, e.g.*, U.S. Glob. Change Res. Program, *Fifth National Climate Assessment* (2023), chs. 11, 15 & 19, https://toolkit.climate.gov/NCA5.

[12] *See* First Street, *The 16th Risk Assessment: The New Cost of Doing Business* 28-29 (Feb. 2026), https://firststreet.org/research-library/the-new-cost-of-doing-business-report [https://perma.cc/LJX7-ZNCS]; Victoria Waldersee, *Porsche Cuts Forecasts Due to Alloy Shortage, Shares Fall*, Reuters (July 23, 2024), https://www.reuters.com/business/autos-transportation/porsche-adjusts-fy-outlook-warns-impairments-due-alloy-supply-shortage-2024-07-22 (describing how floods in Europe "'wiped away the gains from [Porsche's] IPO'" by damaging the supply of aluminum alloy).

[13] *See, e.g.*, Basel Committee on Banking Supervision, Climate-related Risk Drivers and Their Transmission Channels § 2.3 (Apr. 2021), https://www.bis.org/bcbs/publ/d517.pdf. *See also supra* note 5 at 19. *See also* Mkt. Risk Advisory Comm. of the Commodity Futures Trading Comm'n, *Managing Climate Risk in the U.S. Financial System* 19 (Sept. 9, 2020), https://www.cftc.gov/sites/default/files/2020-09/9-9-20%20Report%20of%20the%20Subcommittee%20on%20Climate-Related%20Market%20Risk%20-%20Managing%20Climate%20Risk%20in%20the%20U.S.%20Financial%20System%20for%20posting.pdf.

[14] Joanna Setzer & Catherine Higham, *Global Trends in Climate Change Litigation: 2025 Snapshot* 50, The

---

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

40. None of these observations are novel. Investors have long recognized climate change as a serious and growing financial risk,[15] and for over a decade have been developing and implementing sophisticated practices to assess and manage that risk, as described below.

41. Not all businesses face climate risks equally. Industry-led frameworks such as the Recommendations of the Task Force on Climate-related Financial Disclosures (TCFD) identify industries with heightened exposure to climate-related financial risk.[16] Industries more affected by physical risk include agriculture, buildings and infrastructure, and tourism. Those most exposed to transition risk include fossil fuel-based industries, energy-intensive manufacturers, and transportation providers. Experts also agree that the financial institutions – banks, insurance companies, asset owners, and asset managers – are uniquely vulnerable to climate risk because their core activities (lending, underwriting, and investment) depend on the value of underlying assets which may themselves be exposed to physical and transition risks.[17]

---

Grantham Res. Inst. on Climate Change and the Env't., London Sch. of Econ. & Pol. Sci. (2025), https://www.lse.ac.uk/granthaminstitute/publication/global-trends-in-climate-change-litigation-2025-snapshot (last visited Feb. 27, 2026). *See also* PRI, *Investor Briefing: Institutional Investor Action on Climate Risk as the World Approaches the 1.5°C Limit of the Paris Agreement* (June 2025), https://public.unpri.org/download?ac=23610.

[15] Indeed, leading figures have long described the threat to the financial system as genuinely existential. For example, in 2015, Mark Carney – then Governor of the Bank of England – warned that climate change posed a direct threat to financial stability. In his landmark "Breaking the Tragedy of the Horizon" speech, Carney emphasized that climate risks were foreseeable, material, and already affecting asset valuations and capital allocation, and warned that delayed adaptation heightened the risk of abrupt market corrections, stranded assets, and systemic disruption. Bank of England, *Breaking the Tragedy of the Horizon – Climate Change and Financial Stability* (Sept. 29, 2015), https://www.bankofengland.co.uk/-/media/boe/files/speech/2015/breaking-the-tragedy-of-the-horizon-climate-change-and-financial-stability.pdf. More recently, Günther Thallinger, a board member at Allianz SE – one of the world's largest insurers – warned that once the planet reaches 3°C of warming "[t]he financial sector as we know it ceases to function. And with it, capitalism as we know it ceases to be viable." Damian Carrington, C*limate Crisis on Track to Destroy Capitalism, Warns Top Insurer*, The Guardian (Apr. 3, 2025), https://www.theguardian.com/environment/2025/apr/03/climate-crisis-on-track-to-destroy-capitalism-warns-allianz-insurer.

[16] TCFD is composed of "experts from various organizations, including … asset managers [and] pension funds" convened "[o]n request of G20 Finance Ministers and Central Bank Governors" to develop a framework for disclosures given the financial materiality of climate change. TCFD, About, https://www.fsb-tcfd.org/about (last visited Feb. 26, 2026).

[17] *See* TCFD, *Implementing the Recommendations of the Task Force on Climate-related Financial Disclosures* §§ D, E (Oct. 2021),  https://assets.bbhub.io/company/sites/60/2021/07/2021-TCFD-Implementing_Guidance.pdf (the TCFD provides supplemental guidance for the financial sector as well as non-financial industries that are "more likely to be financially impacted than others due to their exposure to certain transition and physical risks around greenhouse gas (GHG) emissions, energy, or water dependencies associated with their operations and products."); U.S. Dep't of the Treasury, *Homeowners Insurance Costs Rising, Availability Declining as Climate-Related Events Take Their Toll* (Jan. 16, 2025), https://home.treasury.gov/news/press-releases/jy2791.

CLASS ACTION COMPLAINT - 10

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

42.     In this way, climate risk overlaps with but is not reducible to sectoral risk. Rather, it is a risk factor that cuts across sectors, geographies, and asset classes such that companies in the same industry might face very different risk levels.[18] For example, regional banks along the Gulf Coast may face greater exposure to climate risk than those in the Great Lakes due to having loan portfolios that are vulnerable to losses from hurricanes and flooding; utilities with transmission lines in fire-prone regions face greater likelihood of physical risk impacts as wildfires increase in frequency and intensity; and any number of companies in diverse sectors may face different levels of risk depending on how exposed their supply chains are to both climate disasters and regulatory or market shifts.[19] And, as Cushman knows well, a real property management company that plans for and hardens its services against climate impacts is less risky than one that fails to proactively mitigate its exposure.[20] Because different companies within the same industries may face varying levels of exposure, traditional sector-level diversification alone is insufficient to manage climate risk. A climate-blind investor can assemble a sectorally-balanced portfolio that nevertheless bears a very high level of exposure to climate risk because the individual companies it invests in are disproportionately vulnerable to the financial impacts of climate change.

43.     As a practical consequence of the interconnected and cross-sectoral nature of climate-risk, climate-driven shocks can produce highly-correlated financial impacts across

---

[18] Climate risk is also understood to be transverse. That is, it can manifest through multiple risk categories and amplify existing risks. The term is used in the risk management industry to describe a variety of risks that describe "evolving interconnecting threats," including geopolitical risk and cyber security risk. *See, e.g.*, AXA, The Transversal Risk Manager; *Adapting to Interconnected Risk* (July 9, 2025), https://axaxl.com/fast-fast-forward/articles/the-transversal-risk-manager-adapting-to-interconnected-risk. *See also* GARP, *Climate Change: Evolution and Impact on Financial Risk Management* (Aug. 9, 2019), https://www.garp.org/risk-intelligence/culture-governance/climate-change-evolution-and-impact-on-financial-risk-management (describing the financial implications of climate change's interconnected threats: "If a bank is lending to a company that is impacted by either the transition to a low-carbon economy or by physical events (*e.g.,* hurricanes) that can inflict property damage, its credit risk profile is going to change . . . . If, on the other hand, its internal operations are affected by, say, floods or wildfires, its operational risk levels will rise.").

[19] *See* Mkt. Risk Advisory Comm. of the Commodity Futures Trading Comm'n, at 12, 32 (cited *supra* note 13). *See* also, S&P Global, *Risky Business: Companies' Progress on Adapting to Climate Change* 3, 20 (Apr. 3, 2024), https://www.spglobal.com/sustainable1/en/insights/special-editorial/risky-business-companies-progress-on-adapting-to-climate-change [https://perma.cc/5WED-QXH2].

[20] Cushman & Wakefield, *How to Manage Climate Risk: A Practical Sustainability Guide*, *supra* note 7.

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

multiple holdings in a portfolio. A single severe weather event may simultaneously impair real estate collateral held by regional banks, disrupt utility infrastructure, and increase insured losses. In this way, climate risk functions as a cross-cutting financial risk factor capable of aggregating portfolio-wide downside exposure. Accordingly, portfolios that fail to manage climate risk face the prospect of sudden, substantial losses.

44.    For these reasons, prudent fiduciaries must assess and manage climate as a discrete source of financial risk. In the context of an ERISA-governed retirement plan, where risk management is of paramount concern and sudden, severe losses have devastating consequences for retirement security—potentially wiping out years of patient saving—it is particularly important to assess and manage risks, like those posed by climate change, that can aggregate dangerously inside an otherwise balanced portfolio.

### B. Managing Risks, Including Climate Risk, is Standard Practice for Finance Professionals with Defendants' Scale and Sophistication

45.    Prudent asset managers take climate risk seriously and take proactive steps to manage it.[21] Indeed, climate risk analysis and management are now deeply embedded within the financial system. As one expert has noted, "[f]orecasts of climate-related risks are increasingly being incorporated in a wide range of private-sector decision-making, including underwriting, credit rating, securities valuation, portfolio construction, infrastructure resilience, and operations management."[22]

46.    For managers of large sums of money, climate risk management is a standard practice in prudent investment. Asset managers, banks, and insurance companies routinely incorporate climate risk modeling into their due diligence processes, and asset managers of all

[21] Cushman has gone as far as to suggest that climate risk management constitutes "necessary prudence," particularly in the case of investors holding "assets concentrated in geographical locations exposed to climate risk," and highlighted investors' use of technological mapping tools and engagement with regulators. *See* Cushman & Wakefield, *Climate Change: Global Investment Atlas* 4 (2019), https://www.cushmanwakefield.com/-/media/cw/global/insights/research/climate_change___full.pdf.

[22] Madison Condon, *Climate Services: The Business of Physical Risk*, Ariz. St. L.J. 147, 172 (2023), https://scholarship.law.bu.edu/cgi/viewcontent.cgi?article=4631&context=faculty_scholarship.

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

1  sizes and geographies integrate climate considerations into governance, research, and portfolio

2  construction.[23]

3     47.    A robust ecosystem of service providers has developed to facilitate climate risk

4  management, such that even less-sophisticated fiduciaries can readily avail themselves of the

5  tools to account for climate risks. For example, climate risk management services are offered by

6  a number of consultancies, financial and data technology firms, and investment advisory

7  groups.[24] Moreover, several of the largest asset managers, ratings agencies, and index providers

8  have acquired or developed their own proprietary tools (including Blackrock, Wellington, and

9  Moody's).[25] Indeed, Cushman touts its use of sophisticated tools,[26] and even developed its own

10  proprietary climate risk management tool that it marketed to clients.[27]

11     48.    Finance professionals have numerous tools to address climate risk.[28] Among the

12  most popular of these are Heatmapping, Exposure Analysis, Climate Risk Ratings, Scenario

13  Analysis, Stress Testing, and Climate Value at Risk (Climate VaR):

---

[23] *See, e.g.*, GARP, *Fourth Annual Global Survey of Climate Risk Management at Financial Firms* (2022), https://www.garp.org/hubfs/Website/SCR/PDF/GRI_22ClimateRiskSurveyReport.pdf.

[24] *See, e.g.*, PRI, Directory, https://www.unpri.org/supporters (449 signatories to the Principles for Responsible Investment categorized as Service Providers) (last visited February 28, 2026).

[25] Condon, *supra* note 22, at 151, 172-177.

[26] *See, e.g.*, Cushman & Wakefield, *2022 Environmental, Social, and Governance Report* 102-03, https://cwechinox.com/app/uploads/2023/09/Cushman-Wakefield-2022-Environmental-Social-Governance-ESG-Report.pdf (describing its use of a climate risk data analytics tool as part of its "best-in-class research and advisory services").

[27] Cushman & Wakefield, Press & News: Cushman & Wakefield Finds Decarbonizing Existing Real Estate Vital to Addressing Climate Change; Defines Business Case for Net-Zero Buildings (Nov. 18, 2022), https://www.cushmanwakefield.com/en/news/2022/11/cw-finds-decarbonizing-existing-real-estate-vital-to-addressing-climate-change (describing the launch of C&W Green Buildings, a proprietary digital software assessment tool that allows clients to guard against transition risks via "a fast, cost-effective, accurate and auditable way to estimate energy consumption and create a roadmap to greener real estate assets.").

[28] *See, e.g.*, UN Environment Programme, *Database: Sustainability Risk Tool Dashboard* (July 2025), https://www.unepfi.org/themes/climate-change/the-sustainability-risk-tool-dashboard/.

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

| Industry Tools for Climate Risk Management | |
|---|---|
| **Heatmapping** | Identifies concentration of investments in locations exposed to physical risk.[29] Often used by Real Estate Investment Trusts (REITs) and banks with respect to asset-based lending. |
| **Exposure Analysis** | Assesses the concentration of vulnerability to climate-related risks across sectors geographies, and issuers. Often used to determine where climate risks may accumulate.[30] |
| **Climate Risk Ratings** | Assessments by independent researchers that rate sectors, companies, or funds based on risk exposure. Provide a reference point for evaluating climate risk across holdings.[31] |
| **Scenario Analysis** | Evaluates how portfolios may perform under potential future warming and decarbonization trajectories.[32] A common tool of established institutional investors.[33] |
| **Stress Testing** | A form of scenario analysis that models a stress-event on a portfolio to see how it might behave under acute stress conditions and identify vulnerabilities.[34] |

---

[29] *See, e.g.*, Impax Asset Management. *Impax Climate Report 2025* (July 2025), http://fidante.com/sites/default/files/2025-07/2025%20Climate%20Report_0.pdf (showing how it integrates portfolio-level physical climate risk heatmaps into its investment and risk processes to identify exposures to key climate hazards across holdings and sectors).

[30] *See, e.g.,* First Street, *Asset-Level Due Diligence*, https://firststreet.org/pricing/asset-managers (last visited Feb. 27, 2026).

[31] *See, e.g.*, Sci. Climate Ratings: An EDHEC Venture, *Scientific Climate Ratings: From Exposure to Financial Impact: A New Standard in Climate Risk Ratings*, https://scientificratings.com/climate-risk-ratings/# (last visited Feb. 28, 2026); *See, e.g.*, Fin. Stability Bd., Task Force on Climate-related Financial Disclosures (TCFD), *2023 Status Report* (2023), https://www.fsb.org/uploads/P121023-2.pdf (noting that a majority of asset managers and owners had conducted some form of scenario analysis). *See also* BlackRock, Navigating Climate Risk - Aladdin Climate, https://www.blackrock.com/aladdin/products/aladdin-climate (last visited Feb. 28, 2026) (a proprietary scenario analysis tool developed by BlackRock for their own investment management and offered to third parties).

[32] *See, e.g.*, Task Force on Climate-related Financial Disclosures (TCFD), 2023 Status Report. Fin. Stability Bd. (2023), https://www.fsb.org/uploads/P121023-2.pdf (noting that a majority of asset managers and owners had conducted some form of scenario analysis). *See also* BlackRock, cited *supra* note 31.

[33] See, e.g., BlackRock. *2024 Climate Report (Aligned with the Taskforce on Climate-related Financial Disclosure Framework)* (2024) 17-19, https://www.blackrock.com/corporate/literature/continuous-disclosure-and-important-information/climate-report-blkinc.pdf; TIAA-CREF, STAYING THE COURSE: 2024 CLIMATE REPORT, pp. 27-28, https://www.tiaa.org/public/pdf/c/climate_report_2024.pdf.

[34] *See, e.g.*, Amundi Inv. Sols., *From Climate Stress Testing to Climate Value-at-Risk: A Stochastic Approach* 146 (July 2023), https://research-center.amundi.com/article/climate-stress-testing-climate-value-risk-stochastic-approach.

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

| Climate VaR (Value at Risk) | Widely used by major investors, this tool provides forward-looking, return-based valuation assessment to the potential loss in value of an asset, portfolio, or company under various future temperature scenarios.[35] |
| --- | --- |

49.    Sophisticated institutions, including asset managers – and the consultants who advise them – regularly use and advocate for the use of these risk management tools.[36] Industry experts that engage with defined contribution plan sponsors (like Defendants here) have similarly noted that climate-related research (carbon emissions, transition and physical risk research, etc.) can support investment committees and other fiduciaries in managing Plans.[37]

50.    For investors with long-term horizons, the need to manage climate risk is even more pronounced. The longer the investment horizon, the greater the likelihood that climate-related risks will materialize and compound. And given the centrality of retirement savings to the security of retired workers, protecting those savings against significant loss is especially important. The duty to mitigate the risk of such loss is enshrined in ERISA. Accordingly, in the ERISA context, asset managers and other fiduciaries must guard against material risks that could irreparably impair participants' savings.[38]

---

[35] State St. Glob. Advisors, *2024 Task Force on Climate-related Financial Disclosures (TCFD) Report* (June 2025), https://www.ssga.com/library-content/assets/pdf/global/sustainable-investing/2025/inst-tcfd-report-2024.pdf

[36] *See, e.g.*, Mercer, Preparing Portfolios for Climate Change (Nov. 1, 2022), https://www.mercer.com/insights/investments/investing-sustainably/preparing-portfolios-for-climate-change; Meketa Inv. Grp., *Climate Scenario Frameworks* (May 2023), https://meketa.com/wp-content/uploads/2023/05/MEKETA_Climate-Scenario-Frameworks.pdf. *See also* UT News, Investors Want Better Climate Risk Disclosure (July 26, 2023), https://news.utexas.edu/2023/07/26/investors-want-better-climate-risk-disclosure/ (noting a comprehensive survey of 439 institutional investors found an overwhelming majority of investors demanding disclosure of climate risk, because that information can affect a company's health and performance).

[37] *See, e.g.*, Ed McCarthy, *Climate Change and Benchmarking Risk for Retirement Plan*s, Plansponsor (Aug. 18, 2021), https://www.plansponsor.com/in-depth/climate-change-benchmarking-risk-retirement-plans/.

[38] Climate-related events have already bankrupted companies such that the risk of total asset wipe-out is a real, material concern that requires modelling. For example, Pacific Gas & Electric, one of the largest utilities in the U.S., filed for bankruptcy in 2019 due to wildfire liability exacerbated by extreme heat and drought. *See* BloombergNEF, *PG&E Liabilities for California Wildfires Led to Bankruptcy* (2024), https://tnfd.global/wp-content/uploads/2024/10/BNEF_When-the-Bee-Stings_PGE.pdf.

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

51.    Accordingly, climate risk management tools have been widely adopted by retirement plan fiduciaries, in view of their long-term investment horizons and heightened exposure to systemic shocks late in the investment lifecycle.[39] Such practices represent the baseline expectation for prudent investment management.

52.    If anything, standard climate risk management tools likely underestimate the risks posed by climate change and the need for aggressive mitigation measures.[40] Against this backdrop, institutions that fail to adopt even the most basic climate risk management practices are not just behind the curve – they are dangerously out of step with current practices. And institutions that have integrated climate risk tools actively manage climate risk as an evolving risk, updating their practices to reflect expert advice, improved data, and evolving due diligence standards.[41]

53.    As detailed below, Cushman has demonstrated exactly this kind of agility in its core business strategy by regularly updating its climate risk assessments and planning for a range of future scenarios. Cushman and its affiliates deploy a centralized governance strategy to oversee the Company's vast network of subsidiaries, which makes Cushman's failure to apply those same principles to protect the retirement savings of its workers all the more glaring and indefensible.

**C.    Cushman has Long Recognized that Managing Climate-Related Financial Risk is Necessary to Protect Pecuniary Interests.**

54.    For decades, Cushman has positioned itself as an industry leader in sustainability

---

[39] *See, e.g.*, Md. St. Ret. and Pension Sys., *Annual Climate Risk Assessment* (2026), https://sra.maryland.gov/sites/main/files/file-attachments/climate_risk_report_final_version_v9_rev_br_final_for_website.pdf?1770049492.

[40] *See, e.g.*, Eric Roston, *Climate Risk Consultants Need More Oversight, Law Professor Says*, Bloomberg (Apr. 17, 2023), https://www.bloomberg.com/news/articles/2023-04-17/climate-risk-consulting-sector-needs-scrutiny-law-professor-says?leadSource=uverify%20wall [https://perma.cc/BX44-7MVV].

[41] *See* Cushman & Wakefield, *How to Manage Climate Risk: A Practical Sustainability Guide supra* note 7, at 16 ("Put simply, evaluating and managing climate risk is not a process that ends. In fact, the clearer the picture at any given moment, the more effective financial planning, asset resilience and strengthening strategies will be.").

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

practices, embedding climate-related considerations into the core of its business. In 1999, Cushman joined the inaugural class of ENERGY STAR-labeled commercial building owners after pledging to assess its office building energy performance using software tools provided by the U.S. Environmental Protection Agency.[42] Over the next decade, Cushman transitioned from an early adopter of climate change mitigation strategies and data-based technologies to a full-blown evangelist. In 2009, the Company entered into a formal partnership with the EPA, agreeing to train others to use the agency's benchmarking tools and encouraging clients to participate in its data gathering initiative.[43] In 2015, after a series of strategic acquisitions turned the Company into a truly global enterprise, Cushman launched its Global Corporate Responsibility Program. "[I]ntended to embed sustainability within [its] corporate operations," the program was sponsored by executives including the Global Chief Operating Officer. In announcing the program, Cushman touted a "commitment to sustainability as a pillar of [its] culture"[44] and stated that it "strive[s] to actively participate in public policy engagement on climate change."[45]

55.    By 2017, Cushman had connected the dots between climate change and asset valuation, noting that "[w]ith assets increasingly exposed to rising sea levels and flooding, and challenges like extreme and unseasonal weather patterns, real estate professionals cannot afford to ignore climate change."[46] It followed that recognition with increasingly precise accounting of greenhouse gas emissions at the entity- and portfolio-levels, in support of its efforts to lower the

---

[42] Kathryn Janda and Stuart Brodsky, *Implications of Ownership: An Exploration of the Class of 1999 ENERGY STAR® Buildings* 8, Consumer Behav. and Non-Energy Effects 161 (2000), https://www.aceee.org/files/proceedings/2000/data/papers/SS00_Panel8_Paper13.pdf.

[43] EPA, *Cushman and Wakefield to Green Real Estate Through Landmark Agreement with EPA* (Jan. 6, 2009), https://www.epa.gov/archive/epapages/newsroom_archive/newsreleases/5fef98879da2869f8525753600640e14.html

[44] Cushman & Wakefield, *Corporate Social Responsibility Report 2015* 16 (September 2016), https://assets.cushmanwakefield.com/-/media/cw/global/about-us/documents/corpresponsibilityreport-2015.pdf?rev=6a5d38a8669c452194d5d37b88e7313e .

[45] *Id.* at 26.

[46] Cushman & Wakefield, *Corporate Social Responsibility Report (2017)* 18, https://cushwake.cld.bz/Corporate-Social-Responsibility-Report-2017.

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

Company's exposure to transition risk. [47]

56.    In 2019, Cushman showcased its developing advisory practice[48] and by 2020, the Company had formalized its investor-facing services, and promoted its expertise in helping "clients evaluate and select buildings and real estate portfolios that are adaptable and will retain value in a rapidly changing environment and climate."[49] The "[management of] climate change opportunities" was identified as a core service offering to investor clients.[50]

57.    The Company's rapid development of risk management practices and its understanding of climate change as a risk to its business and an opportunity to build out its advisory practice was grounded in materiality assessments beginning in 2019, and which by 2020 had identified climate change resilience as a "material topic" related to "[Cushman and client properties retain[ing] value in light of physical climate risks."[51]

58.    In short, even prior to the Class Period, Cushman publicly recognized climate change as a material financial consideration, took active steps to incorporate climate risks and opportunities into its own business, and even held itself out as an expert on climate risk management. The Company well knew that prudent financial stewardship and climate risk considerations went hand in hand.

59.    Cushman's recognition and management of climate risk continued to grow deeper and more sophisticated over the Class Period. In 2021, Cushman announced ambitious emissions reductions goals, again identified "climate change resilience" as a material risk topic (related to

---

[47] Cushman & Wakefield, *Corporate Social Responsibility Report (2018)* 55-56, https://assets.cushmanwakefield.com/-/media/cw/global/about-us/documents/cw_csr_2018.pdf?rev=afc195597804402b94a6b7d82913b2f (last visited Mar. 2, 2026).

[48] *See* Cushman & Wakefield, *Corporate Social Responsibility Report (2019)* 44, https://assets.cushmanwakefield.com/-/media/cw/global/about-us/documents/cw_csr-report-2019.pdf?rev=8e9c9bbb6f854cfcad8ec24c7ce00f82 (last visited Mar. 2, 2026).

[49] Cushman & Wakefield, Corporate Social Responsibility Report *(2020)* 52, https://assets.cushmanwakefield.com/-/media/cw/global/about-us/2021/cw---csr-report-2020.pdf?rev=6a5e0bdbf92b441c9c430788da4cccc4 (last visited Mar. 2, 2026).

[50] Cushman & Wakefield, *Environmental, Social & Governance Report (2021)* 55, https://www.cushmanwakefield.com/-/media/cw/global/about-us/esg-sustainability/cw-2021-esg-report.pdf.

[51] Cushman & Wakefield, *2022 Environmental, Social, and Governance Report, supra* note 26, at 14.

---

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

"helping [its] … properties retain value in light of physical climate risks"),[52] and identified "the potential effects of climate change" as a material risk factor in its annual filing to the SEC.[53]

60.    To address this material concern, in 2022, the Company conducted a formal climate risk assessment. This included "qualitative and quantitative risk assessments and scenario analyses, carried out by [its] internal teams and expert external partners" to evaluate climate-related risks and opportunities to the Company's "business operations and asset values".[54] The assessment evaluated climate-related risks and opportunities over short (0-3 years), medium (4-10 years), and long (10+ years) time horizons, and applied additional industry-standard qualitative risk management tools like exposure mapping and climate risk ratings.

61.    Cushman's scenario analysis applied the same internationally recognized frameworks used by central banks, financial regulators, and institutional investors globally. To assess physical risks, Cushman modeled multiple temperature-based scenarios, including a "slow progress" scenario and a "hot world" scenario.[55] For transition risks, Cushman evaluated various carbon-pricing scenarios to assess how different regulatory environments and market factors could impact its financial performance.[56]

62.    The Company's physical risk assessment revealed that chronic physical risks (including extreme heat and droughts) were the highest-risk hazards across all scenarios, while acute physical risks (including floods, extreme winds, and wildfires) were projected to reach moderate levels in the long term. Cushman noted that "[a]s a company that manages real estate,

---

[52] Cushman & Wakefield, *Environmental, Social & Governance Report (2021), supra* note 50, at 16.
[53] Cushman & Wakefield plc, Form 10-K (2021), at 21, https://www.sec.gov/ix?doc=/Archives/edgar/data/0001628369/000162836922000011/cwk-20211231.htm (further stating that "[t]here can be no assurance that climate change will not have a material adverse effect on our properties, operations or business").
[54] Cushman & Wakefield plc, *2024 UK Annual Report* 14.
[55] *Id.* at 14. Cushman applied two IPCC [Intergovernmental Panel on Climate Change] Sixth Assessment Report warming pathways: a Slow Progress scenario (SSP3-4.5, 1.95°C warming by 2050) and a Hot World scenario (SSP5-8.5, 2.35°C warming) representing worst-case upper bounds.
[56] *Id.* Cushman applied three NGFC [Network for Greening the Financial System] carbon pricing scenarios: Net Zero 2050 ($129/ton by 2030, rising to $1,153/ton by 2050); Delayed Transition ($0/ton through 2030, rising to $576/ton) to Current Policies ($0 throughout).

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

climate and extreme weather events could result in damage or destruction to our managed or corporate properties that are in geographies vulnerable to more frequent and intense events."[57]

63.    For transition risks, Cushman identified four categories of exposure: policy & legal risk; technology risk; market risk; and reputational risk. Cushman found that reputational risk had the highest potential impact to its business, stating that "a slow response to climate-related needs or inability to provide services for climate-related requests could damage our reputation and thus reduce the demand for our services. Further, not hitting our publicly declared SBTs [Science-Based Targets] would pose a reputational risk to the [Company] and could result in loss of revenue from clients, including those with value chain SBT requirements."[58] In other words, Cushman understood that climate risk management was mainstream such that it would be bad for business to not to adopt it.

64.    Notably, for every transition risk Cushman identified in its own assessment, it mapped a corresponding revenue opportunity for its client-facing services: carbon pricing risk meant increased demand for decarbonization project management; regulatory mandates meant increased demand for climate risk scenario analysis and reporting services; shifting market demand meant an opportunity to become the leading provider of low-carbon solutions. Cushman's own climate risk assessment was not merely cosmetic—it was fundamental to their operation and growth plan, serving as both a risk management practice and a business development roadmap.

65.    To facilitate its business development plan, Cushman spent 2022 heavily investing in climate risk management tools, including entering into an agreement with climate risk analytics giant, Jupiter Intelligence, to provide a climate risk data solution to the market and enhance the offerings of its advisory services.[59]

---

[57] *Id.*
[58] Cushman & Wakefield, *2024 UK Annual Report*, *supra* note 54, at 15.
[59] Cushman & Wakefield, *2022 Environmental, Social, and Governance Report*, *supra* note 26, at 102-03. The same year, Cushman also invested in two decarbonization data and analytics tools, Switch Automation and C&W Green Buildings, the former being a proprietary tool marketed to clients. *Id.*

CLASS ACTION COMPLAINT - 20

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

66.    The Company has since positioned itself as an expert on climate risk management, offering client sustainability services, including climate risk assessment[60] and related services like advising on physical climate risk management.[61] Along with promoting these services, Cushman has sought to establish itself as a thought leader in the climate risk mitigation space, publishing hundreds of reports on climate-related financial risk, including 2023's "How to Manage Climate Risk".[62] These publications are often industry-specific, including the real estate sector,[63] logistics and industrials,[64] and agriculture,[65] or targeting certain geographies deemed to be more exposed to climate risk.[66] Cushman's advisory practice has become quite profitable, such that climate risk and related sustainability advisory services now comprise a meaningful part of its overall business and investor-facing advisory services.[67]

67.    Unsurprisingly, Cushman has identified climate risk as a material financial risk to the company throughout the entire Class Period.[68] It has done so with increasing specificity and

---

[60] Cushman & Wakefield, *Building a Better Future: 2024 Sustainability Report* 20-21 (2024), https://digital.cushmanwakefield.com/2024-sustainability-report/.

[61] Cushman & Wakefield, *How to Manage Climate Risk: A Practical Sustainability Guide*, *supra* note 7, at 9.

[62] *See id*.

[63] Cushman & Wakefield, *Insight – Climate Risk Resilience of the City* 13 (Sept. 2021), https://assets.cushmanwakefield.com/-/media/cw/emea/netherlands/insights/whats-next-insight-climate-risk.pdf ("No longer are we speculating about potential physical hazards, we are talking about the scale and the frequency of damage. The systemic impacts of climate change mean that the industry will not only face highly disruptive acute, one-off events but will need to plan and prepare for the permanent, chronic changes happening now too.").

[64] Cushman & Wakefield, *Climate Risk – Logistics & Industrial Global Outlook* (2025), https://cushwake.cld.bz/industrialclimateriskoutlook-05-2025-global-central-en-content-esg-logistics.

[65] Gehan Palipana, The Growing Opportunity for Urban Farms, Cushman & Wakefield (Dec. 8, 2022), https://www.cushmanwakefield.com/en/insights/the-growing-opportunity-for-urban-farms.

[66] Cushman & Wakefield, *Climate Risk: Real Estate of Emergency – The Impact and Opportunities for the Asia Pacific Property Sector* (2022), https://ewengage.my.salesforce.com/sfc/p/#0Y000002Ihkg/a/7R000002w7z6/PcTkJuyLTV9CSbQzikc39wwVj_c4Nu6zl0lsVOF7YHg; Katarzyna Lipka, Why Climate Risks Should Take Centre Stage in Real Estate Strategies in Poland (Aug. 27, 2025), Cushman & Wakefield, https://www.cushmanwakefield.com/en/poland/news/2025/08/why-climate-risks-should-take-centre-stage; Cushman & Wakefield, Exploring Climate Risks Across the UK & Ireland – Sustainability Week 2024 (Nov. 14, 2024), https://www.cushmanwakefield.com/en/united-kingdom/insights/exploring-climate-risks-across-the-uk-and-ireland.

[67] Cushman & Wakefield, *Better Begins Now: 2023 Sustainability Report* 13 (2023), https://cushwake.cld.bz/2023-Sustainability-Report.

[68] *See Cushman & Wakefield plc*, Form 10-K (2021), *supra* note 53, at 20. *See also* Cushman & Wakefield plc, Form 10-K (2022), at 18,

---

CLASS ACTION COMPLAINT - 21

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

precision over time, including disclosing the negative effect of acute physical risks like wildfires in its annual reporting.[69] Recognizing that "the risks and opportunities identified are dynamic and expected to evolve over time," Cushman plans to update its scenario analyses with emerging tools.[70]

68.    Given the materiality of climate change to Cushman, it is no surprise that its internal governance of climate-related financial risk is structured, deliberate, and subject to Board-level oversight. Since 2021, The Board has overseen the implementation of climate risk management tools in the Company's own operations and client-facing services.[71] As of 2023, the Board and its standing committees share responsibility for overseeing climate-related risks and opportunities, including receiving reports from a number of in-house experts to ensure continuous monitoring and evolution of the Company's climate risk management approach on an enterprise-wide scale.[72]

69.    In sum, Cushman has recognized, measured, and managed climate-related financial risks and opportunities within its business operations with increasing precision since 2015. It has invested in risk management tools including scenario analysis and embedded these assessments into risk governance frameworks and client service offerings. All of this information has been developed within the same corporate ecosystem that oversees the Company's retirement plan. That Cushman failed to apply even a fraction of this financial climate risk expertise to the Plan's investment options supports the inference that the fiduciaries of the Plan fell short of managing it with the standard of care required by law.

---

https://www.sec.gov/ix?doc=/Archives/edgar/data/0001628369/000162836923000005/cwk-20221231.htm; Cushman & Wakefield plc, Form 10-K (2023),
https://www.sec.gov/ix?doc=/Archives/edgar/data/0001628369/000162836924000005/cwk-20231231.htm; Cushman & Wakefield plc, 2024 10-K (2024), at 17,
https://www.sec.gov/ix?doc=/Archives/edgar/data/0001628369/000162836925000005/cwk-20241231.htm.

[69] *See supra* note 68.
[70] Cushman & Wakefield plc, 2024 UK Annual Report, s*upra* note 54, at 13, 14.
[71] Cushman & Wakefield, *Environmental, Social & Governance Report (2021)*, *supra* note 50, at 13, 15.
[72] Cushman & Wakefield, *2023 Sustainability Report* 68 (2024), https://cushwake.cld.bz/2023-Sustainability-Report/68/; Cushman & Wakefield, *Building a Better Future: 2024 Sustainability Report*, *supra note 60*, at 29.

CLASS ACTION COMPLAINT - 22

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

**D.  Prudent Management of Climate Related Risks is Consistent with Fiduciary Duties Long Established in the Common Law of Trusts**

70.    Congress enacted ERISA in 1974 to address a looming national crisis: the growing risk that American workers would lack sufficient savings and face poverty in retirement. The legislative record is replete with concern that employers were mismanaging retirement plans, leaving employees exposed to arbitrary losses and broken promises.[73] ERISA was the solution – a comprehensive federal law designed to create stability, accountability, and long-term security in employer-sponsored retirement plans.

71.    In exchange for significant tax benefits and regulatory advantages, retirement plans governed by ERISA are intended to serve the long-term interests of plan participants and their beneficiaries. ERISA accomplishes this by imposing fiduciary duties on those entrusted with managing retirement assets. These duties prescribe that fiduciaries act with care, skill, and undivided loyalty to plan participants.

72.    Among the duties ERISA imposes on fiduciaries is the duty of prudence. Specifically, ERISA requires its fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."[74]

73.    Under ERISA, the prudence analysis focuses on the fiduciary's conduct in making investment decisions. Prudence requires careful selection and oversight of the Plan's investment options. Fiduciaries are required to evaluate investment choices based on principles of risk, return, and diversification, and to do so in light of the plan's purpose and circumstances, ensuring that the Plan's fund options align with participants' long-term financial interests.[75] Moreover, even after initially evaluating and selecting an option for a retirement plan menu,

---

[73] *See, e.g.*, S. Rep. No. 93-383, at 4891-93 (1973); S. Rep. No. 93-127, at 4840-41, 4845-48 (1973).
[74] ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).
[75] 29 C.F.R. § 2550.404a-1 (2025)

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

1   ERISA fiduciaries must continuously monitor investments and remove those that either alone,

2   or in the context of the entire Plan portfolio, are imprudent.[76]

3       74.   Courts interpreting ERISA have long relied on the *Restatement (Third) of Trusts*,[77]

4   which provides that fiduciaries must invest and manage assets "as a prudent investor would,"

5   taking into account "the purposes, terms, distribution requirements, and other circumstances of

6   the trust."[78] For ERISA plans, the trust purpose is clear: to preserve and grow retirement assets

7   so that participants may retire with financial stability. The Restatement emphasizes that the duty

8   of prudence requires fiduciaries to evaluate investment risk in light of this core purpose.[79]

9       75.   Because 401(k)s are often participants' primary source of stability in retirement, it

10  is especially important to ensure against severe principal loss (and not simply chase high

11  returns). Because participants rely on their 401(k)s to be able to enjoy a dignified retirement,

12  such funds are particularly vulnerable to risks that affect broad segments of the market, which

13  can dangerously aggregate in a portfolio and cause sudden, severe losses. These considerations

14  form part of the evaluation of a retirement plan's risk tolerance.

15      76.   Accordingly, it is paramount that fiduciaries entrusted with securing their

16  employees' retirement savings remain apprised of known financial risks, including those

17  stemming from the climate, and manage their trust to mitigate those risks.

18

19  ———————————

20  [76] *Tibble v. Edison Int'l*, 575 U.S. 523, 528-30 (2015).
    [77] *See, e.g.*, *id.* at 528 (stating that "ERISA fiduciary's duty is 'derived from the common law of trusts.'"

21  (quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 570 (1985))).
    [78] Restatement (Third) of Trusts § 90(a) (2007).

22      [79] *Id*. at cmt. e(1).

23

24

25

26

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

# V.   DEFENDANTS FAILED TO CONSIDER AND MANAGE CLIMATE RISK WHEN ADMINISTERING THE PLAN

### A.  The Plan

77.    The Plan is a tax-qualified defined contribution pension plan subject to the provisions of ERISA and is intended to qualify under Internal Revenue Code § 401(k). At all relevant times, the Plan was an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A).

78.    Cushman, as the Plan sponsor, encouraged its employees to defer their income and invest in the Plan.

79.    The Plan covers eligible employees of Cushman, including certain affiliates of Cushman with U.S.-based employees.

80.    As of December 31, 2024, the Plan had approximately $1.7 billion in assets and 23,448 participants. Plans of this size are often referred to as "jumbo plans." In 2024 alone, thousands of Cushman employees and former employees contributed nearly $115 million of their wages to the Plan.

81.    Like other large plans, the Plan has substantial internal resources and access to some of the most sophisticated investment tools and advisers in the marketplace. Because of its size and sophistication, the Plan (and its fiduciaries) has enormous bargaining power to receive superior investment products and services at extraordinarily low cost.

82.    The Plan obtained several services from Fidelity, which acted as recordkeeper, trustee, and investment advisor—concentrating administrative and transactional functions within a single institution.

83.    The Investment Committee adopted an Investment Policy Statement ("IPS") that provides guidelines for the selection and monitoring of investment options included on the Plan's menu.

84.    The IPS specifies that the Investment Committee should consider many factors

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

when selecting and monitoring investment options for the Plan, including but not limited to the following:

- **Business** – Ownership structure, profitability, stability of organization, client, asset base;
- **Investment Staff** – Quality of personnel, depth of resources, turnover, succession planning;
- **Investment Process** – Skilled investment decisions, clear and repeatable processes, understanding of competitive advantages;
- **Risk Management** – Embedded in broader investment process, independently verified;
- **Performance** – Risk-adjusted investment results, compared to appropriate benchmarks and peer groups, measured over multiple shorter- and longer-term periods, including trailing, rolling, and annual results;
- **Operational Due Diligence** – Operational controls, valuation of assets, independent directors;
- **Fees** – Investment expenses should be reasonable for the value provided and benchmarked for reasonability based on the specific type of investment strategy being evaluated.

## B. The Westwood Quality Small Cap Fund

85. In 2021, the Investment Committee selected the Westwood Fund from Fidelity's FundsNetwork for inclusion in the Plan's investment line up. The Fund replaced the Plan's small cap offering, the DFA Small Cap Value Fund (the "DFA Fund").

86. Westwood Management Corp. is the Westwood Fund's investment advisor, and is an affiliate of Westwood Holdings Group, Inc. ("Westwood").

87. Westwood is a Dallas-based investment management boutique and wealth management firm.

88. Prior to March 1, 2021, the Westwood Fund was named the Westwood SmallCap Fund. And prior to March 1, 2017, it was named the Westwood SmallCap Value Fund.

89. Each change of name was accompanied by a change to the Westwood Fund's principal investment strategy.

90. Because the Westwood Fund changed its fundamental principal investment strategy multiple times in the years leading up to and through its inclusion as an option in the Plan, it lacked a clear and repeatable investment process as required by the IPS.

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

91.   The benchmark Defendants selected for the Westwood Fund is the Russell 3000 Index. In the fee disclosures that Defendants provided to participants pursuant to 29 CFR § 2550.404a-5, they identified the Russell 3000 Index as the appropriate benchmark for the Westwood Fund. The Russell 3000 Index is also the benchmark included in the prospectus for the Westwood Fund.

    a.   <u>Defendants Failed to Adequately Consider the Westwood Fund's Extraordinary Levels of Climate-Related Financial Risk When Selecting and Retaining it as a Plan Investment.</u>

92.   The Westwood Fund is dangerously, willfully blind to climate-related financial risks. This can be seen in both Westwood's public disclosures and in the fact that the Westwood Fund maintains a portfolio exposed to extreme levels of climate risk. Indeed, the levels of climate risk regularly seen in the portfolio cannot be reasonably explained except by either a negligent blindness to, or a willful courting of, that risk.

93.   Westwood disclosed in its 2020 PRI Transparency Report that (i) its investment policy did not cover climate change, and (ii) it did not undertake scenario analysis or modeling to assess climate-related risks.[80] The PRI Transparency Report was available to Defendants at the time the Investment Committee added the Westwood Fund to the Plan.

94.   Additionally, at the time of its inclusion into the Plan, the Westwood Fund unreasonably aggregated highly-correlated climate-related financial risks in its portfolio. It did so in two distinct ways: First, the Fund maintained significant overweight positions in sectors disproportionately vulnerable to physical and transition climate risks. Second, across virtually all sectors, the Westwood Fund invested in companies whose operations and business models carried elevated climate-related risks. By adding the Westwood Fund to the Plan, the Investment Committee exposed Plan participants to excessive climate-related financial risk.

95.   Compared to the Russell 3000 Index—Defendants' own benchmark for the

---

[80] Westwood Holdings Group, *PRI Transparency Report* 23, 32 (2020).

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

Westwood Fund—the Westwood Fund demonstrated overweight positions in sectors particularly susceptible to climate-related financial risks. Industry standards, led by widespread adoption of the TCFD Recommendations,[81] identify six Global Industry Classification Standard (GICS) sectors that are particularly exposed to financial risk from climate-related events.[82] At the time of its selection, the Westwood Fund was overweight in five of the six sectors relative to its own benchmark, the Russell 3000 Index. As a result of these allocations, the Westwood Fund had twice as much exposure to climate-related financial risk as its benchmark index when it was added to the Plan.

96.    The financial risk stemming from the Westwood Fund's allocation to climate-vulnerable sectors was amplified by the stock selection choices the Fund made within those sectors. Many of the companies that the Fund included in its portfolio demonstrated no or poor climate risk management and were asymmetrically exposed to climate-related financial risk as opposed to other investment opportunities within the Westwood Fund's benchmark.

97.    For example, several of the Westwood Fund's holdings during the relevant periods operated in sectors with clear and well-documented physical climate vulnerabilities. These included, for example, REITs holding exclusively timberlands, many in areas particularly exposed to wildfires; regional banks with geographically-concentrated loan portfolios in areas with heightened exposure to hurricanes, and fossil fuel producers facing high degrees of both physical climate risk due to the geographic location of their assets and transition risks related to global changes in policy and shifting consumer attitudes regarding fossil energy.

98.    The Fund's appetite for climate risk was not limited to its over-investment in sectors understood to carry elevated exposure to climate-related financial risk. Even in those sectors that normally serve as a hedge against climate-related financial risk, the individual stocks the Westwood Fund selected from were uniquely exposed to financial risks stemming from climate

---

[81] *See* TCFD, *supra* note 17.
[82] These sectors are Energy, Utilities, Materials, Industrials, Financials, and Real Estate.

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

change. For example, over half of its Consumer Discretionary holdings in 2021 consisted of companies with unusually high exposure to climate-related risks, leading to the sector being exposed to geographic concentration in areas expected to face increased impact of physical climate risk. This degree of risk aggregation is indicative of the Westwood Fund's self-professed failure to reasonably consider climate-related financial risk in its risk modeling.

99.    Furthermore, the Fund's trend of over-exposure to climate risk worsened over the period during which it appeared on Cushman's 401(k) menu. Even as climate risk modeling grew more sophisticated, the Fund's climate-blindness grew more severe. A year-to-year comparison (2021 & 2025) of sector allocations reveals that the Westwood Fund increased its exposure to industries and geographies most vulnerable to transition and physical climate risks, while decreasing its exposure to sectors that hedge climate risk and are more resilient to financial shock.

100. By Q4 2025, the Westwood Fund had increased its holdings in companies in the TCFD-identified climate vulnerable sectors to 74.35%, as compared to its benchmark Russell 3000 Index's 32.73%. In other words, Westwood was now 127% more exposed to climate-risky sectors than its benchmark.

101. Likewise, the Fund's selection of individual stocks that were disproportionally exposed to climate-related financial risk also increased since the Fund was added to the Plan. For example, regional banks that the Fund selected for its Financial Sector allocation were overwhelmingly concentrated in climate-vulnerable regions, meaning that their geographically-focused loan portfolios were broadly exposed to severe weather events, insurance market instability, and property value impairment, thereby amplifying portfolio-level credit risk. Similarly, energy companies the Fund selected for its Utilities Sector allocation faced (and still face) significant transition risks due to generating an outsized portion of their electricity from

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

coal-powered sources.[83]

102. Information about the Fund's approach to climate-related financial risk and the excessive levels of these risks in its portfolio were available to Defendants. Each year, notwithstanding the evolving standards for climate risk management, Westwood disclosed its disregard of climate-related financial risk through PRI Reporting. In each such disclosure, Westwood indicated that it did not have a process to identify, assess, or manage climate-related risks in the portfolios it managed, including the Westwood Fund.[84]

103. Before selecting the Westwood Fund for the Plan, Defendants failed to adequately consider the Westwood Fund's risk modeling approach and the degree of climate-related financial risk it imposed on the Plan's participants.

104. Under the terms of the IPS, Defendants should have, but failed to, adequately consider that there was a deficit in the Westwood Fund's risk management processes before selecting, and when monitoring, the Westwood Fund as an investment option in the Plan. This, notwithstanding Cushman's considerable sophistication in assessing and managing climate-related financial risk, prioritization of that knowledge throughout its enterprise (with Board-level oversight), and acknowledgement that "underlying climate-related risks exist" and that "it

---

[83] Indeed, the Fund has not carried any constituents in the Utilities Sector that do not rely on coal-power generation since 2021 and, in Q4 2025, recently initiated a new position in a company generating almost 1/3 of its electricity from coal-powered sources, compared to the average of 16.2% in the electricity marketplace. *See* U.S. Energy Info. Admin., FAQs: What is U.S. electricity generation by energy source? (last updated Feb. 29, 2024), https://www.eia.gov/tools/faqs/faq.php?id=427&t=3.

[84] In 2021, Westwood disclosed that it did not conduct scenario analysis, had not identified any climate-related risks or opportunities, and had no board-level oversight of climate risk. *See* Westwood Holdings Group, *Public RI Report* 27-29 (2021) [https://perma.cc/FZ2N-55KU]. By 2023, the firm's disclosures showed not only a lack of progress, but a deeper entrenchment in its failure to act. Westwood explicitly stated that it had no process to identify, assess, or manage climate-related risks, used no climate metrics or variables affecting its investments during the reporting year, and had not assessed the resilience of its investment strategy in different climate scenarios, including a sub-2°C scenario. *See* Westwood Holdings Group, *Public RI Report* 29-30 (2023) [https://perma.cc/FZ2N-55KU]. Meanwhile, Cushman was systematically following industry guidance and implementing climate risk management on an enterprise scale. By 2021, Cushman had conducted a materiality assessment in preparation for running scenario analyses and other climate risk assessments. By 2023, Cushman had run multiple climate scenarios and implemented Board-level oversight of climate risk metrics. All the while, Cushman continued to advise investors on climate risk management and generate revenue by telling its clients that they needed to do everything that Westwood failed to do as a matter of prudent investment management. *See supra* ¶¶ 59-62.

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

is imperative to fully understand the level and type of hazards your asset or portfolio is exposed to and the potential impacts. This requires a tactical response."[85]

105. As a result of Westwood's lack of tactical response to risks arising from climate change (or any response at all), the Plan was continuously (and increasingly) exposed to unreasonable levels of climate-related financial risk that made it unsuitable for inclusion as an investment option in the Plan.

b.  The Westwood Fund's Performance Substantially Underperformed its Benchmark While Also Carrying Excess Risk.

106. Prior to being added to the Plan, the Westwood Fund experienced consistent and material underperformance compared to its own benchmark, the Russell 3000 Index.

107. During the 1-, 3-, 5-, and 10-year trailing periods preceding its inclusion in the Plan, the Westwood Fund underperformed the Russell 3000 Index by wide margins. As of year-end 2020, the Fund had returned just 2.16%, compared to 20.89% for the Russell 3000 Index. Over the prior 3-, 5-, and 10-year periods, it delivered 10.90%, 4.99%, and 6.68%, respectively – falling short of its benchmark by 3.59%, 10.44%, and 7.12%.

| Trailing Period (as of 12/31/2020) | Westwood Returns (%) | Russell 3000 Index Returns (%) | Underperformance (%) |
|---|---|---|---|
| 1-Year | 2.16 | 20.89 | -18.73 |
| 3-Year | 10.9 | 14.49 | -3.59 |
| 5-Year | 4.99 | 15.43 | -10.44 |
| 10-Year | 6.68 | 13.8 | -7.12 |

108. As required by the IPS, Defendants should have, but failed to, adequately consider the Westwood Fund's significant underperformance prior to its inclusion in the Plan relative to its benchmark.

109. As demonstrated in the following table, this underperformance continued after the

---

[85] Cushman & Wakefield, *Climate Risk: Global Cities Outlook*, *supra* note 1, at 6.

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

Westwood Fund was included in the Plan.

| Trailing Period (as of 12/31/2025) | Westwood Returns (%) | Russell 3000 Index Returns (%) | Underperformance (%) |
|---|---|---|---|
| 1-Year | -0.06% | 17.15% | -17.21% |
| 3-Year | 7.06% | 22.25% | -15.19% |
| 5-Year | 6.57% | 13.15% | -6.58% |
| 10-Year | 8.25% | 14.29% | -6.04% |

110. As required by the IPS, Defendants should have, but failed to, adequately consider that the Westwood Fund's underperformance continued after its inclusion in the Plan over multiple short- and longer-term periods, including trailing, rolling, and annual returns.

111. The underperformance cannot be explained by market risks affecting all securities belonging to the market capitalization segment in which Westwood concentrated its focus. By way of example, the DFA Fund, outperformed the Westwood Fund every year since 2021 (the year the Westwood Fund replaced the DFA Fund as one of the Plan's investment options).

112. The Westwood Fund's sustained underperformance has caused losses to the accounts of Plaintiff and the other Plan participants.

113. This underperformance is even more stark when viewed on a risk-adjusted basis. The Westwood Fund evaluates its risk-adjusted returns using a Sharpe Ratio, which measures how much excess return (risk premium) an investment earns relative to the level of risk taken to achieve it, reflecting whether investors were adequately rewarded for the risks they bore. The lower the Sharpe Ratio, the less the investor was compensated for the level of risk being taken.

114. The following table compares the Sharpe Ratios of the Westwood Fund to Russell 3000 Index over trailing 3-, 5-, and 10-year periods. The Westwood Fund consistently provided investors with worse risk-adjusted returns than its own benchmark index.

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

| Sharpe Ratio (Trailing) | | | |
|---|---|---|---|
| Comparator | 3-yr | 5-yr | 10-yr |
| Westwood Fund | 0.17 | 0.29 | 0.46 |
| Russell 3000 Index | 1.20 | 0.70 | 0.85 |

115. Per the IPS, Defendants were required to consider risk-adjusted performance when evaluating the Plan's investment options. The Fund's substantial and persistent risk-adjusted underperformance should have been a major red flag. It is evidence of both Defendants' failure to prudently monitor the Plan's investment options and failure to follow plan documents.

116. As a result of the Westwood Fund's underperformance and excessive risk, the Defendants should have removed the Westwood Fund from the Plan's lineup. They did not.

    c.   The Westwood Fund's Fees are Unreasonably High for an Investor with the Plan's Scale.

117. Defendants added the Ultra share class of the Westwood Fund to the Plan in 2021, at which point the fund had a gross expense ratio of 108 bps (1.08%) and net expense ratio of 79 bps (0.79%).

118. The DFA Fund that Defendants replaced with the Westwood Fund on the Plan's line up had a lower net expense ratio of 51 bps (0.51%) in the same year.[86]

119. An expense ratio of 0.79% for a domestic equity mutual fund is unreasonably high for one of the largest retirement plans in the United States to pay.

120. According to expense ratio benchmarking performed by Brightscope and the Investment Company Institute in 2019, the average expense ratio for a domestic equity fund mutual fund held by 401(k) plans with more than $1 billion (jumbo plans) in plan assets was 0.35%, less than half of the Westwood Fund's expense ratio.

121. Due to its large size, the Plan was a "jumbo plan" for years before it invested in the Westwood Fund.

---

[86] Since 2021, the DFA Fund has decreased its fees, now sitting at 31 bps as of December 31, 2025.

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

122. In 2019, a reputable retirement investment advisor, Callan, prepared a detailed analysis of fee levels and trends across multiple asset classes and investment strategies. The 2019 Callan analysis revealed that the average expense ratio within the most expensive domestic equity segment—U.S. Smid, Small, and Micro Cap Equity—was 0.60%.

123. On information and belief, the average expense ratio for funds has declined since Brightscope and Callan conducted their respective studies in 2019.

124. Cushman could have negotiated for a fee more in line with the norm for jumbo plans or found an alternative option offering a similar or better performance track record with lower fees. It failed to do so.

125. The Westwood Fund's high expenses are not caused by exceptionally large investment in the fund's investment processes. Rather, the excessive expenses associated with the Westwood Fund are caused, in large part, by a 10 bps (0.10%) Sub-transfer Agency ("Sub-TA") fee embedded in the expense ratio. This Sub-TA fee is transferred to the Plan's recordkeeper, Fidelity, for keeping administrative records of a plan's investment in a fund.

126. Based on information and belief, the DFA Fund that the Westwood Fund replaced did not pay a Sub-TA fee to Fidelity.

127. Based on information and belief, the Westwood Fund is currently the only investment option on the Plan's menu that pays Fidelity a Sub-TA fee.

128. Based on information and belief, Defendants have permitted Fidelity to retain this Sub-TA fee as compensation. This Sub-TA fee is assessed in addition to an annual record-keeping fee that is deducted from Plaintiff's and all other participants' accounts. Fidelity does not provide the Plan with greater recordkeeping services in exchange for the Sub-TA fee.

129. Defendants should have, but failed to, adequately consider that the Westwood Fund's fees were above average and were not reasonable given the Westwood Fund's underperformance and sub-par risk management processes.

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

d. <u>The Westwood Fund Has Been Rejected as an Investment Option By Investors of Cushman's Scale and Sophistication.</u>

130. Both Westwood and the Westwood Fund have experienced tepid market adoption that the Defendants should have—but failed to—consider when selecting and retaining the Westwood Fund on the Plan's line up.

131. Westwood's mutual fund complex has experienced a significant decline in market acceptance in the past decade. The complex has experienced net outflows every year since at least 2015. Since 2015, Westwood's mutual fund complex has experienced a compound annual growth rate in assets under management of negative 4.8% per year. During this same period, the value of common security markets such as the Russell 3000 Index more than doubled, further highlighting the deterioration of the market's acceptance of Westwood's mutual funds.

132. The Westwood Fund has similarly experienced limited market acceptance, particularly among large, sophisticated 401(k) investors such as the Plan.

133. At the time Defendants selected Westwood for inclusion on the Plan menu, very few 401(k) plans of equal or greater size offered the Fund as an option. Even smaller, less-sophisticated plans almost uniformly steered clear of the Fund. Indeed, even among investors who might have different goals than retirement savers, the fund was a fairly unpopular, niche option.

134. None of Cushman's peers in the real estate industry offered the Westwood Fund in their retirement plans at the time it was added to the Plan, nor have any offered it subsequently. A similar lack of adoption is observed across all 401(k) plans, with the Westwood Fund being found in a mere 0.006% of such plans.

135. Notably, Fidelity clients comprise the overwhelming majority (79%) of plans that utilize the Westwood Fund. Based on information and belief, Defendants' selection and retention of the Westwood Fund was influenced by Fidelity, which receives Sub-TA fees from Westwood.

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

136. The Westwood Fund has lost investors since being added to the Plan. Since 2021, the Westwood Fund has lost approximately 20% of its investor asset base.

137. In contravention of the IPS, Defendants failed to adequately consider the lack of market acceptance and the declining asset base of the Westwood Fund before selecting and retaining it as an investment option in the Plan.

**C. The Inclusion and Retention of the Westwood Fund in the Plan Caused Losses to Plaintiff and the Plan.**

138. The Investment Committee Defendants selected and retained the Westwood Fund as an investment option for the Plan, thereby breaching their ERISA duties owed to Plan participants. This breach continues to the present day.

139. ERISA requires the Investment Committee Defendants to give "appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment . . . of the [P]lan[]," and then to "act[] accordingly."[87] This standard requires fiduciaries to engage in a thorough, unbiased deliberative process when selecting and monitoring investment options in the Plan. That process must reflect the care, skill, prudence, and diligence of a reasonable fiduciary under similar circumstances, and includes accounting for all material financial risks, such as those stemming from climate change.

140. As described in the preceding sections, Defendants' process was flawed and failed to adequately consider and act upon information revealing the Westwood Fund exposed the Plan to substantial climate-related financial risk; exhibited chronic underperformance and poor risk-adjusted returns; had unreasonably high fees; gave rise to prohibited transactions with a party-in-interest; and had limited market acceptance.

141. Defendants had access to all information needed to identify the aforementioned

---

[87] 29 C.F.R. § 2550.404a-1(b).

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

issues affecting Westwood Fund's management since before it was added to the Plan.

142. Both the initial selection and continued retention of the Westwood Fund are glaring indications that the fiduciaries responsible for investment selection and monitoring either ignored obvious warning signs, or failed altogether to conduct the required initial and ongoing evaluation, in dereliction of their obligation to safeguard the retirement security Cushman's employees.

143. Cushman avers that "[f]inancial well-being is another key component of our overall employee benefits strategy" and that it "routinely assess[es] and update[s] [its] benefits offerings to ensure they stay aligned with industry standards".[88.] The facts suggest otherwise. If Cushman wants to live up to its stated values, it must improve the safety of its 401(k) offerings and Plan administration and make whole those employees who were harmed after trustingly investing in unreasonable options like the Westwood Fund. Plaintiff seeks this remedy via this complaint.

144. As a result of Defendants' failure to adequately evaluate the risks, performance, and fees of the Westwood Funds, Plaintiff and the Plan have incurred millions of dollars in losses.

## VI.   CLASS ACTION ALLEGATIONS

145. Plaintiff brings this action on behalf of the following Class:

146. All participants and beneficiaries in the Cushman & Wakefield 401(k) Plan whose individual accounts are or were invested in the Plans' Westwood Quality SmallCap Fund from January 1, 2021 through the date of judgment (the "Class Period"). The Defendants, their beneficiaries, and immediate families are excluded from the Class. Class certification is appropriate under Fed. R. Civ. P. 23(a) and (b)(1), (b)(2) and/or (b)(3).

147. **Numerosity.** The number of Class members is so large that joinder of all its members is impracticable. While the exact number of Class members is not presently known,

---

[88] *See* Cushman & Wakefield, *Building a Better Future: 2024 Sustainability Report*, *supra note 60*, at 48.

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

publicly available information indicates that the Class likely includes hundreds, if not thousands, of participants. The Plan currently has 23,448 participants with nearly $1.7 billion in assets, of which $38,637,796 was invested in Westwood as of December 31, 2024. The precise number and identities of Class members can be ascertained through discovery from records maintained by the Defendants and/or the Plan's recordkeeper, Fidelity. Accordingly, the numerosity requirement is satisfied.

148. **Commonality.** As to the members of the Class, this case presents numerous common questions of law and fact, among them:

    a. Whether the Investment Committee Defendants were and are ERISA fiduciaries responsible for selecting, retaining, removing and monitoring the Plan investments;

    b. Whether the Investment Committee Defendants breached their ERISA fiduciary duties in selecting the Westwood Fund as an investment option for the Plan during the Class Period;

    c. Whether the Investment Committee Defendants breached their ERISA fiduciary duties in monitoring or failing to monitor the investment options in the Plan during the Class Period;

    d. Whether the Investment Committee Defendants breached their ERISA fiduciary duties in failing to remove the Westwood Fund from the Plan during the Class Period;

    e. Whether the Investment Committee Defendants breached their ERISA fiduciary duties by failing to consider financial risks related to climate change in carrying out their responsibilities during the Class Period;

    f. Whether the Investment Committee Defendants and Cushman breached their ERISA fiduciary duties by failing to monitor the actions of Plan fiduciaries they appointed to ensure that they comply with ERISA;

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

g.  Whether Fidelity is a party in interest within the meaning of 29 U.S.C. § 1106(a)(1);

h.  Whether the Investment Committee Defendants caused the Plan to directly or indirectly transfer to Fidelity any assets of the plan; and

i.  Whether the Plan and its participants suffered losses as a result of Defendants' breach of their fiduciary duties.

149.  **Typicality.** Plaintiff's claims are typical of the claims of the Class because (a) to the extent that Plaintiff seeks relief on behalf of the Plan pursuant to § 502(a)(2) of ERISA their claims are not only typical of, but the same as, a claim under § 502(a)(2) brought by any other Class Member; (b) to the extent that Plaintiff seeks equitable relief, that relief would affect all Class Members equally; all of the Class members were injured and continue to be injured in the same manner by the alleged breaches of fiduciary duty.

150.  **Adequacy.** Plaintiff will fairly and adequately assert and protect the interests of the Class and is committed to the vigorous representation of the Class. Plaintiff retained counsel, ClientEarth USA, Inc. ("ClientEarth") and Cohen Milstein Sellers and Toll PLLC ("Cohen Milstein"), who are experienced in complex commercial, class action, and ERISA litigation, and Plaintiff has no interests antagonistic to or in conflict with the interests of the Class.

151.  Plaintiff's counsel has agreed to advance the costs of the litigation contingent upon the outcome. Counsel are aware that no fee can be awarded without the Court's approval.

152.  The Class may be certified under Rule 23(b)(1), (2), and/or (3).

153.  **Rule 23(b)(1).** As an ERISA breach of fiduciary duty action, this action is a classic 23(b)(1) class action. Prosecution of separate actions by individual members would create the risk of (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendants, or (B) adjudications with respect to individual class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

their ability to protect their interests.

154. **Rule 23(b)(2).** Through their practices alleged, Defendants have acted on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole. Here, the challenged conduct at issue not only can be, but must be enjoined or declared unlawful only as to all of the Class members or as to none of them. Because the focus of Plaintiff's claims is on Defendants' actions, and because the relief sought is equitable plan-wide relief, there are simply no individual issues. The requirements for Rule 23(b)(2) certification are plainly met.

155. **Rule 23(b)(3).** Questions of law and fact common to the members of the Class predominate over individual questions, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy. The losses suffered by some of the individual members of the Class may be small, and many of the Class members may not have the resources to bear the expense and burden of individual litigation to enforce their rights. Moreover, the fiduciary defendants to the Plan named herein were and are obligated to treat all Class members similarly because ERISA imposes uniform standards of conduct on fiduciaries. Individual proceedings, therefore, would pose the risk of inconsistent adjudications. A class action will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. There will be no difficulty in the management of this action as a class action. Given the nature of the allegations and the time and expense necessary to conduct this litigation, there is little likelihood that an individual Class member would have an interest in individually controlling the prosecution of this matter.

## VII.    CAUSES OF ACTION

### Count I

**Fiduciary Breaches for Failure to Select and Monitor Plan Investments Prudently, Loyally, and in Accordance with Plan Documents in Violation of ERISA § 404, 29 U.S.C. § 1104**
(Against Investment Committee Defendants)

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

156. Plaintiff restates and incorporates the allegations of the preceding paragraphs as if set forth fully herein.

157. At all relevant times, the Investment Committee Defendants were fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A)(i). As fiduciaries, they were required to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," in accordance with ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B). These fiduciary duties include the ongoing duty to monitor all plan investments and remove imprudent investments from the Plan's menu.

158. ERISA's duty of prudence required the Investment Committee Defendants to follow reasonable standards of investment due diligence by giving appropriate consideration to those facts and circumstances that, given the scope of their fiduciary investment duties, they knew or should have known were relevant to the particular investments of the Plan, and then to act accordingly.[89]

159. ERISA's duty of loyalty required the Investment Committee Defendants to act solely in the interest of plan participants and beneficiaries, and for the exclusive purpose of providing benefits and defraying reasonable administrative expenses.[90]

160. ERISA additionally required the Investment Committee to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III."[91] The IPS is one of the "documents and instruments governing the plan."[92]

161. As set forth in detail above, the Investment Committee Defendants breached these fiduciary duties by, *inter alia*:

---

[89] 29 C.F.R. § 2550.404a-1.
[90] ERISA § 404 (a)(1)(A); 29 U.S.C. § 1104(a)(1)(A).
[91] ERISA § 404 (a)(1)(D); 29 U.S.C. § 1104(a)(1)(D).
[92] *See California. Ironworkers Field Pension Tr. v. Loomis Sayles & Co*., 259 F.3d 1036, 1042 (9th Cir. 2001).

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

a. Selecting the Westwood Fund without considering the fund's historical underperformance and excessively high fees; the availability of reasonably-priced, better performing alternatives; or the fund's unreasonable aggregation of climate-related financial risks in its portfolio;

b. Failing to monitor the Plan investment options and remove the Westwood Fund by, among other things: (i) failing to avoid or mitigate conflicts of interest related to Fidelity's fee interest in the Westwood Fund; (ii) failing to adequately consider the Westwood Fund's continued underperformance, unreasonable expense ratio, and continued concentration of climate-related risks in its portfolio; (iii) failing to remove the Westwood Fund from the Plan despite the fact that it was selected based on an imprudent and disloyal process which was not in line with industry standard risk management practices or the Company's peers; (iv) failing to adequately consider whether continuing to invest Plan assets in the Westwood Fund constituted party-in-interest transactions with Fidelity;

c. Failing to monitor the Westwood Fund in conformance with the IPS's specifications by failing to adequately consider pertinent factors about the Westwood Fund's business, investment process, risk management, performance and/or, fees.

162. As a direct and proximate result of the above breaches of fiduciary duties, the Plan and its participants have suffered losses in retirement assets in an amount to be proven at trial, for which all Defendants named in this Count are jointly and severally liable.

163. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a participant or beneficiary to bring a civil action "for appropriate relief under section 1109 of this title."

164. ERISA § 409(a), 29 U.S.C. § 1109(a), mandates that "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary."

165. Pursuant to ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), Plaintiff seeks all available and appropriate remedies against the Investment Committee Defendants to redress violations of 29 U.S.C. § 1104 described herein, including, but not limited to the relief set forth below in the Prayer For Relief.

166. ERISA 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to "(A) enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

167. Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff seeks all available and appropriate equitable relief against the Investment Committee Defendants to redress the violations of 29 U.S.C. § 1104 described herein, including, but not limited to the relief set forth below in the Prayer For Relief.

**Count II**
**Violations of ERISA § 406(a), 29 U.S.C. § 1106(a) for Engaging in Prohibited Transactions**
(Against Investment Committee Defendants)

168. Plaintiff restates and incorporates the allegations of the preceding paragraphs as if set forth fully herein.

169. ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), prohibits transactions that constitute direct or indirect furnishing of furnishing of goods, services, or facilities between the plan and a party in interest.

170. ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), prohibits transactions that

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

constitute direct or indirect transfers of a plan assets to, or use of a plan's assets by or for the benefit of, parties in interest, and prohibits fiduciaries from causing a plan to engage in such transactions.

171. Fidelity Management Trust Company was the Plan's trustee before and after the Westwood Fund was added to the Plan.

172. Fidelity Management Trust Company is a party in interest to the plan because, *inter alia*, it is a trustee of the Plan and provides services to the Plan.[93]

173. Fidelity Investments was the Plan's recordkeeper before and after the Westwood Fund was added to the Plan.

174. Fidelity Investments is a party in interest to the plan because, *inter alia*, it provides services to the Plan.[94]

175. Because the Westwood Fund was added to the Plan, Fidelity Investments received additional indirect compensation from the Plan at a rate of 0.10% per dollar invested in the Westwood Fund without providing any additional recordkeeping or services to the Plan.

176. The Investment Committee Defendants caused the Plan to engage in multiple violations of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), by causing the repeated transfer of Plan assets directly and/or indirectly to Fidelity Investments and/or Fidelity Management Trust Company in the form of various direct or indirect fees, which constituted multiple, knowing violations of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

177. Because the Westwood Fund was added to the Plan, Fidelity Investments provided Sub-Transfer Agency services to the Plan in connection with the Westwood Fund.

178. The Investment Committee Defendants caused the Plan to engage in multiple violations of ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), by knowingly causing Fidelity Investments to furnish transfer-agency services to the Plan, which constituted multiple, knowing

---

[93] ERISA § 3(14)(A), (B); 29 U.S.C. § 1002(14)(A), (B).
[94] ERISA § 3(14)(B); 29 U.S.C. § 1002(14)(B).

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

1   violations of ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C).

2      179. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a participant or beneficiary

3   to bring a civil action "for appropriate relief under section 1109 of this title."

4      180. ERISA § 409(a), 29 U.S.C. § 1109(a), mandates that "[a]ny person who is a

5   fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties

6   imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan

7   any losses to the plan resulting from each such breach, and to restore to such plan any profits of

8   such fiduciary which have been made through use of assets of the plan by the fiduciary, and

9   shall be subject to such other equitable or remedial relief as the court may deem appropriate,

10   including removal of such fiduciary."

11      181. Pursuant to ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. § 1132(a)(2) and §1109(a),

12   Plaintiff seeks all available and appropriate remedies against the Investment Committee

13   Defendants to redress violations of 29 U.S.C. § 1104 described herein, including, but not limited

14   to the relief set forth below in the Prayer For Relief.

15      182. ERISA 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to

16   bring a civil action to "(A) enjoin any act or practice which violates any provision of this

17   subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to

18   redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the

19   plan."

20                        **Count III**

21
**Failure to Monitor Other Fiduciaries in Violation of ERISA §404, 29 U.S.C. § 1104**
(Against Cushman)

22      183. Plaintiff restates and incorporates the allegations of the preceding paragraphs as if

23   set forth fully herein.

24      184. As alleged above, Cushman was and continues to be a Named Fiduciary to the Plan

25   and a *de facto* fiduciary under 29 U.S.C. § 1002(21).

26      185. As a fiduciary, Cushman was required by ERISA § 404(a)(1)(A) to manage and

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

1    administer the Plan and the Plan's investments "solely in the interest of the participants and

2    beneficiaries" of the Plan and for the "exclusive purpose" of providing benefits to the

3    participants and beneficiaries of the Plan.[95]

4    186. As a fiduciary, Cushman was required by ERISA § 404(a)(1)(B) to discharge its

5    duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that

6    a prudent man acting in a like capacity and familiar with such matters would use in the conduct

7    of an enterprise of a like character and with like aims."[96]

8    187. Under ERISA, a fiduciary charged in a plan document with the authority to select

9    other fiduciaries has an ongoing duty to monitor the performance of those persons to ensure that

10   their performance has complied with statutory standards, and they have a duty to remove any

11   appointed fiduciary who is not complying with ERISA's fiduciary requirements, including

12   ERISA §§ 404(a)(1) and 406, 29 U.S.C. §§ 1104(a)(1) and 1106.

13   188. Based on information and belief, Cushman delegated to the Investment Committee

14   discretionary authority and control over the Plan and its assets, and appointed members to the

15   Investment Committee.

16   189. As a result of this delegation and appointment, Cushman was obligated to monitor

17   the performance of the Investment Committee at reasonable intervals to ensure that their

18   performance complied with the terms of the Plan and ERISA.[97]

19   190. Cushman failed to monitor, detect, or remedy the Investment Committee's breaches

20   described in the preceding paragraphs.

21   191. As a direct and proximate result of the above breaches of fiduciary duties, the Plan

22   and its participants have suffered millions of dollars of losses in retirement assets, for which all

23   Defendants named in this Count are jointly and severally liable.

24   192. As a direct and proximate result of the above breaches of fiduciary duties, Plan

25

26   [95] 29 U.S.C. § 1104(a)(1)(A).
     [96] 29 U.S.C. § 1104(a)(1)(B).
     [97] 29 C.F.R. § 2509.75-8, FR–17 (2024).

CLASS ACTION COMPLAINT - 46

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

1    participants are exposed to significant, unreasonable risk of financial loss in addition to that

2    which they have already suffered.

3         193.  ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a participant or beneficiary

4    to bring a civil action "for appropriate relief under section 1109 of this title."

5         194.  ERISA § 409(a), 29 U.S.C. § 1109(a), mandates that "[a]ny person who is a

6    fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties

7    imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan

8    any losses to the plan resulting from each such breach, and to restore to such plan any profits of

9    such fiduciary which have been made through use of assets of the plan by the fiduciary, and

10    shall be subject to such other equitable or remedial relief as the court may deem appropriate,

11    including removal of such fiduciary."

12         195.  Pursuant to ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a),

13    Plaintiff seeks all available and appropriate remedies against Cushman and the Investment

14    Committee Defendants to redress violations of 29 U.S.C. § 1104 described herein, including,

15    but not limited to the relief set forth below in the Prayer For Relief.

16         196.  ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary

17    to bring a civil action to "(A) enjoin any act or practice which violates any provision of this title

18    or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such

19    violations or (ii) to enforce any provisions of this title or the terms of the plan."

20         197.  Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff seeks all available

21    and appropriate equitable relief against Cushman and the Investment Committee Defendants to

22    redress the violations of 29 U.S.C. § 1104 described herein, including, but not limited to the

23    relief set forth below in the Prayer For Relief.

24

25

26

Client Earth USA, Inc.           Cohen Milstein Sellers & Toll PLLC
501 Santa Monica Blvd., Suite 510  1100 New York Ave. NW, Suite 800
Santa Monica, CA 90401           Washington, DC 20005
Tel.: (310) 361-7006             Tel.: (202) 408-4600

1    ## VIII.    PRAYER FOR RELIEF

2    198. Plaintiff, on behalf of the Plan and the Class, respectfully requests that the Court

3    award the following relief for all Counts:

4    a.    A declaration that Cushman and the Investment Committee Defendants breached

5    their fiduciary duties to the Class in the manner described herein;

6    b.    A declaration that the Investment Committee Defendants caused prohibited

7    transactions with the Plan's assets in the manner described herein;

8    c.    An order requiring each fiduciary found to have breached his/her/its fiduciary duty

9    to the Plan to jointly and severally pay such amount or surcharge to the Plan as is

10    necessary to make the Plan whole for any losses which resulted from said breaches,

11    plus pre-judgement and post-judgment interest;

12    d.    An Order appointing a special master to oversee the development and

13    implementation of a revised investment policy statement ("IPS") for the Plan

14    providing procedures regarding (i) the Plan's risk tolerance for all categories of

15    financially material risks, (ii) the integration of prudent processes respecting the

16    selection and monitoring of investment options, (ii) scrutiny of investment

17    managers and advisors for adhesion to industry standard risk management

18    procedures, (iii) standards for climate-competency and emergent risk management

19    assessment within the Cushman & Wakefield Investment Committee, (iv)

20    communications with Plan Participants regarding the risk profile of each

21    investment option, (v) specific climate-risk mitigation and monitoring requirements

22    for plan menu options in light of the failures identified herein, and (vi) triggers for

23    reassessment of investment options with high expense ratios and underperformance

24    as compared to broad indices;

25    e.    An order requiring the Defendants to assess all investment options according to the

26    new IPS and, where an investment option is imprudent under such guidance, to

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

1  remove the investment option from the Plan;

f.  An injunction removing the fiduciaries who have breached their fiduciary duties from their roles as fiduciaries from the Plan, and an order appointing an independent fiduciary to manage the assets of the Plan;

g.  An injunction requiring all fiduciaries to avoid all future ERISA violations, including, but not limited to, removing the Westwood Quality SmallCap Fund from the Plan and administering the Plan's investment line-up consistently with their duties of prudence and loyalty;

h.  An award of pre-judgment interest on any amounts awarded to Plaintiff and the Class pursuant to law;

i.  Certification of the Class, appointment of Plaintiff as Class representative, and appointment of Cohen Milstein and ClientEarth as Class Counsel;

j.  An award of Plaintiff's attorneys' fees, expenses and/or taxable costs, as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine;

k.  An order awarding, declaring or otherwise providing Plaintiff and the Class any other appropriate equitable relief under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial by jury on all issues so triable, pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Client Earth USA, Inc.
501 Santa Monica Blvd., Suite 510
Santa Monica, CA 90401
Tel.: (310) 361-7006

Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600

1    DATED this 3rd day of March, 2026

2                                    */s/ John S. Rossiter, Jr.*
                                     John S. Rossiter, Jr., WSBA #23876
3

4                                    CLIENT EARTH USA, INC.
                                     Kimberly Blake (*pro hac vice* forthcoming)
5                                    Benjamin Segal (*pro hac vice* forthcoming)
                                     501 Santa Monica Blvd., Suite 510
6                                    Santa Monica, CA 90401
                                     Tel.: (310) 361-7006
7
                                     Michelle C. Yau (*pro hac vice forthcoming*)
8                                    Daniel R. Sutter (*pro hac vice forthcoming*)
                                     Ryan A. Wheeler (*pro hac vice forthcoming*)
9                                    COHEN MILSTEIN SELLERS & TOLL PLLC
                                     1100 New York Ave. NW ● Suite 800
10                                   Washington, DC 20005
                                     (202) 408-4600
11                                   myau@cohenmilstein.com
                                     dsutter@cohenmilstein.com
12                                   rwheeler@cohenmilstein.com

13                                   *Attorneys for Plaintiff and the Proposed Class*

14

15

16

17

18

19

20

21

22

23

24

25

26